UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
JEWEL I. TODMAN,

                    Plaintiff,            07 Civ. 10473(JSR)(DFE)

        -against-                         REPORT AND RECOMMENDATION
                                          TO JUDGE RAKOFF
_____
MICHAEL J. ASTRUE,
Commissioner of Social Security,

                    Defendant.
----------------------------------X

DOUGLAS F. EATON, United States Magistrate Judge.

     Represented by the law firm of Meltzer, Fishman, Madigan &
Campbell, plaintiff Jewel I. Todman seeks judicial review of a
final decision of the Commissioner of Social Security denying her
application for Disability Insurance Benefits.

     For the reasons discussed below, I recommend that Judge
Rakoff (a) deny plaintiff's May 14, 2008 motion for judgment on
the pleadings (Docket Item # 8), and (b) partially grant the
Commissioner's July 16, 2008 cross-motion for judgment on the
pleadings (Docket Item # 10).  In my view, the record clearly
supports the Commissioner's decision to the extent that it found
that plaintiff was not disabled from November 2001 through April
2006.  Prior to May 2006, Ms. Todman's primary claim was that her
cardiovascular medication caused frequent urination at night,
causing her to fall asleep during the days.  Starting around May
2006, she has an additional claim of nerve problems in her hands,
wrists and one elbow, and she says this has limited her ability
to work at any job that would require (a) repetitive fingering or
handling, or (b) extensive use of a typewriter or computer
keyboard.  In my view, the record was not fully developed on this
additional claim.  I recommend that Judge Rakoff remand this case
for further proceedings to determine whether plaintiff has been
disabled during the period from May 2006 to the present.

                    FACTUAL BACKGROUND

     Ms. Todman was born on November 2, 1952.  Starting in
January 1982, she worked actively for the New York City Police
Department for almost 20 years and rose to the level of
detective.  In October 2001, "as a precursor to her retiring in
the near future," the Police Department mandated that she take an

                         -1-

exercise stress test.  (Tr. 162.)  She took the test on October 30, 2001 and did well; the test was ended after seven minutes because she had "achieved" her "target heart rate."  (Tr. 160.) Two days later, she felt a little dizzy.  Five days later, on November 4, 2001, she felt a burning sensation radiating up to her chest, and was hospitalized.  (Tr. 162.)  She was diagnosed as having suffered a heart attack, and was discharged from the hospital on November 6, 2001.  (*Id.*)  Since then, she has not worked.  She had additional stress tests in December 2001 and May 2004, and did well.  (Tr. 124-25, 356.)

On January 25, 2002, three physicians on an Article II Medical Board of the Police Pension Fund unanimously decided that Ms. Todman could not perform the full duties of a New York City police officer, and they approved her application for Accident Disability Retirement under the provisions of New York's "Heart Bill."  (Tr. 117-20.)  As a detective, during an 8-hour workday, she had been required to: (1) walk for 4 hours; (2) stand and sit for 1 to 2 hours each; (3) frequently lift 25 pounds; (4) handle, grab and grasp big and small objects for 1 hour; (5) reach for 1 hour; and (6) write and type for 1 hour.  (Tr. 56, 412.)

At the time of the January 23, 2007 hearing, she was living with her husband and two daughters (aged 14 and 19) in a house in Hicksville, New York.  She had previously lived in Peekskill, New York.  (Tr. 68, 628, 638-42.)  An older daughter lives in the Bronx.  (Tr. 54.)  In July 2002, plaintiff's cardiologist noted that she was discharged from cardiac rehabilitation because of poor attendance.  He wrote that plaintiff stopped attending the rehabilitation sessions because she had to babysit her grandchild.  (Tr. 143.)

Plaintiff is somewhat overweight; she is 5'8" tall (Tr. 119), and her weight has gone down from 204 pounds in February 2002 (Tr. 141) to 175 pounds in April 2006 (Tr. 335.)  She has a General Education Diploma, and she attended college for one year. (Tr. 61, 639.)  She used to be able to type 100 words per minute. (Tr. 651-52.)

PROCEDURAL BACKGROUND

Ms. Todman filed her first application for disability insurance benefits on February 21, 2002.  (Tr. 48-63.)  Less than a year after her heart attack, she and her husband applied to be prospective adoptive parents; on October 10, 2002, her treating physician Dr. Salvatore Pasquale supported that request and stated that her level of general health and vitality was "well." (Tr. 168-69.)  However, I see no evidence that plaintiff and her

husband actually became adoptive parents.

On March 24, 2003, Administrative Law Judge ("ALJ") Dennis G. Katz held a hearing with plaintiff and her attorney Daniel Burger.  (Tr. 202-26.)  In a decision dated April 25, 2003, ALJ Katz determined that plaintiff was not disabled.  (Tr. 13-23, repeated at Tr. 375-85.)

On August 7, 2003, plaintiff filed a second application for disability benefits, which was denied.  She then filed a request for a second hearing.  (Tr. 373, 389-92, 395, 404-09.)

On July 2, 2004, the Appeals Council denied review of plaintiff's 2002 application; this caused the ALJ's April 25, 2003 decision to become the final decision of the Commissioner.  (Tr. 3-6.)  On September 23, 2004, she filed a civil action in our Court (04 Civ. 7013 (JSR)) to appeal the denial of her 2002 application.  (Tr. 284.)

On January 26, 2005, ALJ Katz held a second hearing.  In a decision dated February 14, 2005, he again found that Ms. Todman was not disabled.  (Tr. 243-53, 622-35.)

On March 23, 2005, Judge Rakoff "so ordered" a stipulation that remanded the case involving plaintiff's 2002 application to the Commissioner, pursuant to Sentence Four of 42 U.S.C. §405(g).  (Tr. 285-86.)

On September 30, 2005, the Appeals Council issued an order that: (1) vacated ALJ Katz's February 14, 2005 decision, (2) consolidated the 2002 and 2003 applications, (3) remanded them to an ALJ for further proceedings, and (4) directed the ALJ to "make 'every reasonable effort' to recontact" the treating physicians.  (Tr. 266-70.)

Prior to the next hearing, the new ALJ (James B. Reap) obtained no updated records written by Dr. Pasquale (plaintiff's internist) but the ALJ did obtain extensive records (Tr. 335-55, for July 5, 2005 to April 20, 2006) written by Dr. Frank Dorsa (plaintiff's cardiologist).  The ALJ also obtained a report (Tr. 365-69) written by Dr. Andrew Decker, who apparently was the first physician to test plaintiff concerning any problem with her hands and arms.

On January 23, 2007, plaintiff appeared before ALJ Reap with attorney Brian J. Crawley from the law firm of Meltzer, Fishman,

Madigan & Campbell.  Medical expert Dr. Harold Bernanke [1]
testified by telephone at Tr. 653-61.  Vocational expert Donald
Slive testified in person at Tr. 661-69.

On July 27, 2007, ALJ Reap determined that plaintiff was not
disabled, and issued a 10-page decision denying disability
insurance benefits.  (Tr. 230-39.)  (The date stamp at the end of
the decision contained an error giving the year as 2005.)  The
record does not contain a copy of the Appeals Council Action, but
it is undisputed that ALJ Reap's decision became the final
decision of the Commissioner.

On November 20, 2007, plaintiff filed a new Complaint in our
Court, which Judge Rakoff accepted as related to 04 Civ. 7013.
On December 3, 2007, Judge Rakoff referred the case to me to
write a Report and Recommendation on any motions.  On March 28,
2008, the Commissioner filed an Answer and a one-volume
transcript of the administrative record ("Tr.").

On May 14, 2008, plaintiff moved for judgment on the
pleadings, and annexed a memorandum of law by Mr. Crawley.  On
July 16, 2008, the Commissioner opposed the motion and cross-
moved for judgment on the pleadings, annexing a memorandum of law
by AUSA Susan C. Branagan.  Neither party filed any further
papers.  (On September 17, 2008, my law clerk spoke to Edward J.
Madigan, a partner in the Meltzer law firm.  Mr. Madigan advised
that Mr. Crawley was no longer with the firm, and that Mr.
Madigan is now handling Ms. Todman's case.)

           The medical records from
           July 5, 2005 through October 3, 2006

The transcript contains medical records from October 2001 to
October 2006, but I shall now summarize the medical records that
were written after the 2005 hearing and before the 2007 hearing.

On July 5, 2005, plaintiff had an echocardiogram which
showed that: (1) her left ventricular systolic functioning was
normal; (2) her right ventricular systolic functioning was
normal; (3) her left and right atrial size were normal, and there

---

[1]     By coincidence, Dr. Bernanke had been one of the three
physicians on the Medical Board of the Police Pension Fund who,
five years earlier, had approved plaintiff's application for
Accident Disability Retirement from the Police Department.  (Tr.
117-120, esp. 120.)  ALJ Reap noted this at the start of the
hearing.  (Tr. 638.)

was no evidence of an atrial septal defect; (4) the mitral valve was normal in structure and function, but there was mild mitral regurgitation; (5) the tricuspid valve was normal in structure and function, but there was mild tricuspid regurgitation; (6) the aortic valve was normal in structure and function; (7) the pulmonic valve was not well seen but was grossly normal; (8) there was no pulmonic valvular stenosis, but there was trace pulmonic valvular regurgitation; (9) the aortic root was normal in size; (10) the pulmonary artery, which was not well visualized, was probably normal in size; and (11) there was no pericardial effusion.  (Tr. 353-55.)

On July 13, 2005, Dr. Dorsa wrote that plaintiff was getting up a lot at night to urinate and that she "blames the meds." Accordingly, he took her off one of those medications, namely Altace.  (Tr. 342.)  She had occasional sharp pain in mid-chest which lasted from three to five minutes.  (Tr. 342.)  However, he described her coronary artery disease as "stable," and her hypertension as "controlled."  (Tr. 343.)

On August 16 and on October 6, 2005, Dr. Dorsa noted that plaintiff's urination had decreased after she had stopped taking Altace, although it was still a problem.  (Tr. 340-41.)  She did not have headaches, myalgias [2] or angina, [3] but she did have occasional mild ankle edema (swelling).  He again described her coronary artery disease and her hypertension as "stable."  (Id.)

On December 29, 2005, Dr. Dorsa reported that Dr. Pasquale had temporarily discontinued Zocor because plaintiff's myalgias had gotten worse.  Dr. Dorsa permanently discontinued the Zocor and put her on Pravachol instead.  (Tr. 338.)

On February 9, 2006, plaintiff told Dr. Dorsa that she had severe pain in her left hip, and "thinks it's caused by Pravachol."  He x-rayed her left hip, and the x-ray showed "minor arthritis."  He discontinued the Pravachol.  She was not experiencing angina.  (Tr. 337.)

On March 9, 2006, plaintiff told Dr. Dorsa that her "hip pain has much improved."  As before, she was not experiencing angina.  He started her on Niaspan.  (Tr. 336.)

_____

[2]    Myalgia is muscle pain.  Dorland's Illustrated Medical Dictionary at 1083 (27th ed. 1988) ("Dorland's").

[3]    Angina is "spasmodic, choking, or suffocative pain." Dorland's at 82.

On April 20, 2006, Dr. Dorsa wrote that plaintiff did not tolerate the Niaspan because of flushing, and she was now back on Pravachol.  She was exercising and she was eating less, and her weight was down to 175 pounds.  Her coronary artery disease was "stable" and her hypertension was "controlled."  As before, she was not experiencing angina.  (Tr. 335-36.)

On July 5, 2006, plaintiff's attorney sent Dr. Dorsa's recent records to ALJ Reap.  (Tr. 334.)  It is unclear why her attorney did not submit updated records from her internist Dr. Pasquale.  In my view, the ALJ should have asked for them, but I also think the more important records were those from the cardiologist Dr. Dorsa, and those were obtained.

On October 3, 2006, Dr. Andrew Decker performed an electromyographic study and a nerve conduction velocity study. (Tr. 365-69.)  His report found that plaintiff had (a) left-sided ulnar nerve compression neuropathy at the left elbow, and (b) moderately severe right-sided (and mild left-sided) median nerve compression neuropathy at the wrists, "such as seen in a carpal tunnel syndrome."  (Tr. 366.)  He recommended that she avoid pressure on the left elbow and use an elastic wrap on it. (Plaintiff is right-handed; Tr. 647.)  Dr. Decker also recommended wrist exercises, wrist splints, and vitamin B6.  (Tr. 367.)  He told her to return to his office in two months; there is no evidence as to whether she did so, or as to whether she followed any of his recommendations.

<u>The hearing testimony of the plaintiff
on January 23, 2007 (Tr. 638-52)</u>

Plaintiff testified as follows:

(1) She is unable to work because she gets "very bad side effects from the medication I take," primarily frequent urination at night.  She is in bed from 9:00 p.m. to 7:00 a.m., and sometimes has to go to the bathroom 8 or 9 times during those 10 hours.  During the daytime, she finds herself falling asleep unexpectedly two or three times a day, typically while watching television.  (Tr. 639-40, 645, 651.)

(2) She occasionally drives a car to the pharmacy to pick up her medicine.  On other trips, she is driven by her husband or by a taxi.  (Tr. 641-42, 649-50, 652.)

(3) In 2006, she developed arthritis in her left hip and can no longer exercise.  (Tr. 644-45.)  She can walk for about a half hour, but then gets tired and has a tightness in her chest.  To

relieve the tightness, she goes home and sits for 30 minutes to an hour.  (Tr. 648, 650.)

(4) She still engages in the same activities that she discussed four years earlier at the 2003 hearing.  These include: (a) reading and watching television; (b) dusting; (c) light cleaning; (d) socializing; (e) seeing her cardiologist every six months; (f) occasional laundry; (g) helping her kids with their homework; and (h) attending religious services.  (Tr. 644.)

(5) She has no problems paying attention, finishing what she starts, and following directions.  (Tr. 644.)

(6) In 2002 and 2003, she was using Nitroglycerin as needed. (Tr. 644.)  But Nitroglycerin was not among her medications in September 2005 or in January 2007.  (Tr. 639-40.)  (This is consistent with the medical records at Tr. 340-41 and 335-37, which show that she was not experiencing angina from August 16, 2005 through April 20, 2006.)

(7) On a typical day, she makes herself a light breakfast and coffee, then sits on her couch and watches TV or naps.  (Tr. 645-46.)  On the weekends, she occasionally goes shopping at the supermarket.  (Tr. 645, 648.)  She does not go to movie theaters; instead she watches videos at home.  (Tr. 646.)

(8) She has problems lifting; the most weight she can lift is about 8 pounds.  (Tr. 646.)

(9) About 8 or 9 months before the January 23, 2007 hearing (hence around late April 2006), she started feeling "electric shocks" in her hands.  Hence, she sometimes spends 1 or 2 hours a day rubbing her hands.  (Tr. 646, 649.)  Sometimes she finds it hard to write, and she does not use a computer as much as she used to.  She can button buttons, pick up coins from a table, zip a zipper, tie shoelaces, and use a pushbutton phone, but her husband unscrews the caps from her medications.  (Tr. 646-48, 651-52.)

<u>The hearing testimony of Harold Bernanke, M.D.
on January 23, 2007 (Tr. 653-61)</u>

Dr. Bernanke did not personally examine the plaintiff in anticipation of the third hearing, but he reviewed her medical records.  Mr. Crawley's memorandum of law (at page 14) complains that at Tr. 658 the transcript of Dr. Bernanke's telephonic testimony says one word was "INAUDIBLE."  But Mr. Crawley cross-examined Dr. Bernanke (Tr. 659-60), and did not complain that he

had any problem understanding what Dr. Bernanke was saying.  Mr. Crawley had ample opportunity to clarify any ambiguities or contradictions.

Dr. Bernanke testified that plaintiff was capable of performing "light" work on a full-time basis.  (Tr. 658-59.)  He stated as follows:

(1) Plaintiff's risk factors include: (a) hypertension; (b) elevated cholesterol; (c) a non-Q-wave myocardial infarction in November 2001; (d) non-obstructive coronary disease; (e) smoking about a half a pack of cigarettes a day for a "good number of years," even though she stopped at some point after her heart attack; (f) being "somewhat overweight."  (Tr. 654.)

(2) A "non-Q-wave" infarction means that "the scar or the damage therein does not penetrate the full thickness of the myocardial wall in the area where the infarct occurred."  (Tr. 656.)  "That doesn't mean that it may not be serious.  That was proven by elevated Troponin level, which is one and a half times its measure."  (Tr. 654.)  On the other hand, "she has a normal ejection fraction, and more than that she doesn't have any long motion abnormality."  Hence, several tests have indicated that the left ventricle is contracting satisfactorily.  (Tr. 656.)

(3) A cardiac catheretization showed a non-obstructive osteo lesion involving only the outward artery.  There were no other arterial lesions.  (Tr. 654.)

(4) She had some mild left ventricular hypertrophy.  (Tr. 654.)

(5) She recently had a mild degree of proteinuria and borderline creatinine (1.3), but "at this point there is no question of any significant kidney insufficiency."  (Tr. 654.)

(6) Her hip discomfort and pain were attributed to the side effects of the statin drugs she took for cholesterol.  After they were discontinued, she switched to Niaspan, but that drug caused flushing, and "she's currently [back] on Pravachol."  (Tr. 654-55.)

(7) The October 2006 EMG showed changes that were consistent with varying degrees of carpal tunnel syndrome in both hands.  There was also a mild change in the left ulna nerve at the elbow that involved only the motor part, not the sensory part of the nerve at the elbow.  (Tr. 655.)

(8) Her stress tests in December 2001 and May 2004 were done according to the Bruce protocol, [4] and the results were "approximately eight or nine mets [5] and eight and five to 50 NPR." She exercised for more than seven minutes during the December 2001 test, and she exercised for eight minutes during the 2004 test. She did not have any chest pain or arrhythmia during either of the stress tests. She had a normal ejection fraction. (Tr. 655.)

(9) "[B]ased on the medication that's taken that she gave the history of today [Tr. 640: Pravachol, Toprol, Adalat, Ecotrin], none of those are diuretic medications." (Tr. 656.) [6]

(10) She "now gives a history that she was told she had arthritis of the left hip. I don't recall any such mention in the notes I reviewed." (Tr. 656.) [On February 9, 2006, Dr. Dorsa x-rayed plaintiff's left hip, and noted "minor arthritis." (Tr. 337.)]

(11) "I don't know what the dose of Toprol is because that could be a sedating drug at a higher dose. Most people tolerate it, but it can be a sedative." (Tr. 656.)

(12) None of her impairments, when taken individually, meets

---

[4]    The Bruce Test involves walking on a treadmill while the heart, ventilation volumes and respiratory gas exchanges are monitored by an electrocardiograph with various electrodes attached to the body. See Wikipedia.org.

[5]    A "MET" or "metabolic equivalent" is the "ratio of a person's working metabolic rate relative to the resting metabolic rate." One MET is the caloric consumption of a person while at complete rest, although the actual number varies from person to person. A workout of 2 to 4 METs is considered light (but plaintiff's stress tests were much more vigorous.) See Wikipedia.org.

[6]    Mr. Crawley's memorandum, at page 22, asserts that this statement is false, and that one of the side effects of Adalat is frequency of urination. However, Mr. Crawley did not raise this issue during his cross-examination of Dr. Bernanke (Tr. 659-60), nor did he mention this to the ALJ as far as I can see. Even if we assume that plaintiff accurately testified that she has difficulty sleeping at night, this does not prove that she would be unable to stay awake during an 8-hour workday.

or equals the listings, particularly with respect to listings 4.04 and 4.03.  (Tr. 656.)

(13) Her residual functional capacity ("RFC") enables her to perform "light" work.  (Tr. 658.)  In this regard, Dr. Bernanke noted:

    (a) The 2004 stress test and the treating cardiologist's 2005 notes indicate that plaintiff did not have shortness of breath, even though she had been a smoker.  She exercised for eight minutes in 2004, which was a fair amount of work, and she did not have any chest pain.  Instead, she stopped because of fatigue.  "The test was entirely negative." Accordingly, she should be able to walk four or five blocks without difficulty, based on the number of METs of her 2004 stress test.  (Tr. 657, 659.)

    (b) At this hearing, she described difficulties in sleeping, "but that was never mentioned in the clinical record."  (Tr. 657.)

    (c) In terms of manipulation of her hands, the October 2006 EMG tests "do show some changes, but they don't seem to be that profound," and "there is no neurologic consult."  Given her complaints about sensory changes, "she may have some limitation related to the use of her hands."  (Tr. 657-59.)

    (d) Her ability to sit and stand should not be affected.  (Tr. 658.)

    <u>The hearing testimony of the Vocational Expert on January 23, 2007 (Tr. 661-69)</u>

Vocational expert Donald Slive testified as follows:

(1) Plaintiff would be able to perform her former job as a detective.  (Tr. 662-63.)  [As will be seen, the ALJ disagreed. At Tr. 235 and 238, he found that detective work is "generally performed at the medium exertional level," and that plaintiff is unable to perform this past relevant work.]

(2) Her transferable skills include keyboarding, conducting investigations, writing reports, dealing and directing the public, guarding property, enforcing laws and regulations, preventing crime, and using law enforcement equipment.  (Tr. 663.)

(3) She could use her transferable skills to perform the following "light" jobs described in the Dictionary of Occupational Titles: (a) security guard, semiskilled; (b) private investigator, skilled; and (c) patroller for alarm companies or private security companies while driving around in a vehicle, semiskilled. (Tr. 663-64.) If walking is limited to four or five blocks, then she would be able to perform the patroller position and the private investigator positions; the security guard position requires more walking. (Tr. 666.)

(4) Assuming that plaintiff, with her transferable skills, had the capacity to perform only sedentary work, then she would be able to find work as: (a) an investigator, skilled, desk job; (b) skip tracer, semiskilled; and (c) police aide, semiskilled. (Tr. 664-65.) The investigator and skip tracer jobs may also require some standing and walking. (Tr. 669.)

(5) He was not able to identify any jobs using plaintiff's transferable skills that could be performed by alternating between sitting and standing. (Tr. 665.) However, she would be able to perform the following two unskilled jobs that would require her to alternate between sitting for 4 hours and standing for 4 hours: (a) assembler, small products, light work; and (b) electric sealing machine operator, light work. (Tr. 665-66.)

(6) On cross-examination, Mr. Slive conceded that plaintiff would not be able to perform any of the aforementioned light and sedentary jobs if she in fact needs to sleep three to four times during the daytime for approximately one hour each time. (Tr. 667.)

(7) Mr. Slive also conceded that "keyboarding is an important function of th[e] three jobs" of investigator, skip tracer, and police aide; therefore, he seemed to agree that plaintiff might be unable to perform those three jobs if she in fact is limited in keyboarding by a reduction of motor skills due to carpal tunnel or ulna nerve dysfunction. Two other jobs proposed by him (assembler and electric sealing machine operator) would require repetitive fingering and handling; therefore, he seemed to agree that plaintiff might be unable to perform those two jobs if she in fact has more than a mild reduction in her ability to manipulate her fingers and hands. (Tr. 668.)

<u>DISCUSSION</u>

Our Court's review "is limited to inquiring into whether the [Commissioner's] conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous

legal standard." *Beauvoir v. Chater,* 104 F.3d 1432, 1433 (2d Cir. 1997), *quoting Cruz v. Sullivan,* 912 F.2d 8, 11 (2d Cir. 1990).  Pursuant to 42 U.S.C. § 405(g), "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive..."

In evaluating a disability claim, the Social Security regulations require the Commissioner, through the ALJ, to apply a five-step process:

> <u>First</u>, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] <u>next</u> considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the <u>third</u> inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience. . . .  Assuming the claimant does not have a listed impairment, the <u>fourth</u> inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. <u>Finally</u>, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999), *quoting Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (my emphasis added).

At <u>Step One</u>, ALJ Reap determined that plaintiff had not engaged in substantial gainful activity since the date of her alleged onset of disability.  (Tr. 235.)

At <u>Step Two</u>, the ALJ found that plaintiff "has the following severe impairments: status post non-Q-wave myocardial infarction and hypertenstion." (Tr. 235.)  Also at Tr. 235, he wrote:

The objective medical evidence does not substantiate

any severe impairments referable to obesity or carpal
tunnel syndrome.  In this regard, there are no
significant functional limitations which could be
attributable to either condition.  The claimant's
weight has remained relatively stable.  She has no
difficulties with regard to ambulation or movement.
She has been documented as having full fine/gross
manipulation abilities, and has testified to having no
dexterity difficulties.

I agree that the medical evidence does not substantiate any
severe impairments referable to obesity or problems with the
hands and arms.  On the other hand, plaintiff testified that she
has some dexterity difficulties that started in 2006.  (Tr. 646-
48, 651-52.)  She was "documented as having full fine/gross
manipulation abilities," but that was in 2003, long before 2006.
(Tr. 489, 505.)

        At Step Three, the ALJ found that plaintiff does not have an
impairment or a combination of impairments that meets or
medically equals one of the listed impairments in Appendix 1 of
20 C.F.R. Part 404, Subpart P.  "Specifically, there are
insufficient clinical findings to warrant application of medical
listing 4.04, which pertains to ischemic heart disease/coronary
artery disease." (Tr. 235.) [7]

        At Step Four, the ALJ found that plaintiff has the residual
functional capacity to perform light work, because he found that

_____

        [7]  Plaintiff does not dispute the ALJ's finding at Step
Three, at least as to her cardiovascular condition.  Her December
3, 2001 Stress Sestamibi Perfusion Scan results were normal.
During that stress test, she obtained 86% of the maximum
predicted heart rate, and there were no diagnostic ECG changes of
ischemia, nor were any wall motion abnormalities detected.  The
test was terminated after she achieved her target heart rate.
(Tr. 124-25, 147-48, 538.)  On January 7, 2002, Dr. Dorsa wrote
that the occasional left upper chest spasm reported by plaintiff
"is most likely not angina."  (Tr. 538-39.)  He said that she
could begin exercising regularly.  (Id.)  On May 17, 2004, Dr.
Dorsa wrote about that day's stress test; the echocardiogram
results were normal.  (Tr. 356, 537, 594.)  She achieved 81% of
her maximum predicted heart rate, had a normal heart rate
recovery, and there were no diagnostic ECG changes of ischemia.
Her exercise capacity was adequate, and her hypertension was
controlled.  (Id.)  On July 5, 2005, another echocardiogram also
showed normal results.  (Tr. 353-55.

-13-

she can lift and carry objects weighing up to 20 pounds occasionally (10 pounds frequently), and she can sit, stand and/or walk for a total of 6 hours each in an 8-hour workday. (Tr. 235.) [8]  The ALJ also found that plaintiff is precluded from performing her past relevant work as a police detective, which is "generally performed at the medium exertional level." (Tr. 235, 238.)  The ALJ wrote that his RFC assessment "is generally consistent with the opinion of medical expert Bernanke, as adduced at the hearing." (Tr. 236.)

The ALJ acknowledged that lower assessments of plaintiff's RFC had been given by her treating cardiologist Dr. Dorsa and her treating internist Dr. Pasquale.

Dr. Dorsa's July 14, 2003 RFC assessment (Tr. 486-90) essentially found plaintiff capable of performing sedentary work. He wrote that she had the ability to (1) continuously sit at one time for 8 hours; (2) continuously stand at one time for 1 hour; (3) sit for at least 6 hours and stand/walk for less than 2 hours in an 8-hour work day with normal breaks; and (4) lift and carry up to 20 pounds occasionally and 10 pounds frequently. (Tr. 487-88.)  Dr. Dorsa also noted that plaintiff had no significant limitations in her ability to perform repetitive reaching, handling and fingering. (Tr. 489.)  Sedentary work involves lifting no more than 10 pounds at a time.  20 C.F.R. § 404.1567(b).  "Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." *Id*.

On December 1, 2003, Dr. Pasquale filled out a Physical Capacities Assessment questionnaire. (Tr. 504-06.)  He wrote that plaintiff: (1) could sit and stand/walk for 1 hour each,

---

[8]  Light work involves lifting no more than 20 pounds at a time, with frequent lifting or carrying of objects weighing up to 10 pounds.  20 C.F.R. § 404.1567(b).  "A job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." *Id*.  To be considered capable of performing a full or wide range of light work, the plaintiff must have the ability to do substantially all of these activities. *Id*.  Moreover, if the plaintiff can do light work, then she can do sedentary work, unless there are additional limiting factors, such as the loss of fine dexterity or the inability to sit for long periods of time. *Id*.

without interruption, in an 8-hour workday; (2) could lift and/or carry up to 10 pounds occasionally; (3) could use her hands and feet for repetitive actions; (4) could not perform any postural activities; (5) could not tolerate exposure to dust, fumes and gases, but could tolerate occasional exposure to various other environmental factors; and (6) could occasionally drive automotive equipment.  (Tr. 504-06.)  Dr. Pasquale also wrote that plaintiff "is easily fatigued, requires frequent rest." (Tr. 506.)

ALJ Reap disagreed with the treating physicians, and set forth his reasons:

In the instant case, the evidence reflects purely conservative medical treatment following the claimant's myocardial infarction. [9]  She has not required the chronic use of pain medications, nor does she need oxygen supplementation.  There are no hospitalizations chronicled following the claimant's cardiac catheterization in November, 2001.  Multiple post-infarction stress tests have showed good exercise tolerance, with no evidence of ischemia.  The claimant's blood pressure has also been documented as being under good control for extended periods of time. Therefore, the degree of medical treatment shown in the instant case is not consistent with contentions of total disability.

Moreover, the claimant's reported activities of daily living reflect that she is not as functionally compromised as purported. ...  Such a level of activity indicates that the claimant is capable of light [work] and by incorporation, sedentary work.

*     *     *

As for the opinion evidence, considerable credence cannot be accorded to the opinions of treating

_____

[9]  Mr. Crawley's memorandum of law, at page 21, says:  "ALJ Reap's conclusion that Plaintiff is not disabled because Plaintiff has only undergone conservative treatment [and] does not require pain medications, hospitalization or oxygen supplementation sets an impossibly high standard of disability." However, as will be seen, the ALJ stated many additional reasons for his conclusion.

cardiologist and internist Drs. Dorsa and Pasquale, to the extent that they consider the claimant as incapable of performing even sedentary work.  Specifically such opinions are in no way consistent with these practitioners' own treatment records, as well as other examination reports such as Dr. Lathan's.  In this regard, the claimant is continually noted as being in no acute distress.  No anomalies of gait, station, motor function, reflex function, sensory function, respiratory function or range of motion in any body joint have been documented.  The claimant can squat and bend fully, and walk upon her heels and toes.  Dr. Pasquale has characterized the claimant as being well with respect to her general health and vitality level upon an adoption fitness report.  Thus, the conclusion that the claimant is healthy enough to serve as an adoptive parent but would not be healthy enough to perform any manner of work-related activity is clearly contradictory.  Therefore, the opinions of Drs. Dorsa and Pasquale are not found to be objectively corroborated by the clinical medical evidence of record.

Substantial probative weight is assigned to Dr. Bernanke's medical expert testimony regarding the claimant's documented medical condition and overall functionality.  It is note[d] that this physician is a board-certified internist [Tr. 293], who has been duly qualified to render[] medical opinions in cases before the Social Security Administration.  Moreover, his impressions are consistent with the weight of the objective medical evidence, including physical examination and specific cardiac testing results.

(Tr. 237-38.)

The ALJ had already noted the following medical evidence to support his findings:

(1) Dr. Dorsa's July 2003 RFC assessment, which said that plaintiff could lift and carry up to 20 pounds occasionally, and that her prognosis was good.  (Tr. 233.)

(2) Dr. Lathan's report of his December 2003 consultative examination of plaintiff said that: (a) plaintiff was able to perform all activities of personal care and daily living, (b) she appeared to be in no acute distress; (c) she had a normal gait and stance, and was able to squat fully, and walk on her heels

and toes without difficulty; (d) her lungs were clear to
auscultation and percussion; (e) her heart sounds were of normal
rhythm, with no murmurs, gallops or rubs; (f) her range of motion
was fully intact in her cervical and lumbar spine, shoulders,
elbows, forearms, wrists, hips, knees and ankles; (g) her
strength was a 5 out of 5 in all extremities; and (h) her hand
and finger dexterity were intact, with unimpaired grip strength
displayed.   Dr. Lathan opined that plaintiff had a moderate
restriction for activities requiring strenuous exertion.  (Tr.
233-34.)

        (3) The December 2001 and May 2004 stress tests.  (Tr. 233-
34.)

        The Second Circuit has held that the opinions of
"nonexamining sources," such as Dr. Bernanke's opinion, may
"override treating sources' opinions, provided they are supported
by evidence in the record."  *Schisler v. Sullivan*, 3 F.3d 563,
568 (2d Cir. 1993) (citing 20 C.F.R. §§ 404.1572(f), 416.927(f)).

        Agency medical consultants are considered highly
        qualified physicians and experts in social security
        disability evaluations. ...  Thus, a treating
        physician's opinion may be trumped by the opinion of
        the state agency physician, a non-examining source, if
        such opinion is supported by evidence in the record.

*McConnell v. Astrue*, 2008 WL 833968, at *17 (N.D.N.Y. March 28,
2008) (McAvoy, J.).  *See also Riley v. Astrue*, 2008 WL 2696259,
at *17 (S.D.N.Y. July 7, 2008) (Rakoff, D.J., Eaton, M.J.); *Punch
v. Barnhart*, 2002 WL 1033543, at *12 (S.D.N.Y. May 21, 2002)
(Gorenstein, M.J.).

        At Tr. 654-60, Dr. Bernanke gave a reasoned explanation for
his opinion that plaintiff could perform light work, including
"standing and walking for six hours out of an eight-hour day."
(Tr. 659.)  He emphasized the 2004 stress test, in which she
exercised for eight minutes with no chest pain and no arrhythmia.
(Tr. 655.)

        At <u>Step Five</u>, the ALJ found that plaintiff was a "younger
individual" on the onset date, but "closely approach[ed] advanced
age" when she turned 50 years old in November 2002.  (Tr. 238.)
He said that, given her age, education, work experience, and RFC,
she has acquired work skills from her past relevant job as a
police detective that are transferable to other occupations
existing in significant numbers in the national economy.  (*Id.*)
Accordingly, he concluded that she is not disabled.  (Tr. 239.)

With respect to the period from November 2001 through April 2006, I find that the ALJ applied the correct legal standard. His findings are supported by substantial evidence in the record, namely Dr. Bernanke's testimony, Dr. Lathan's report of his December 2003 examination of plaintiff including full grip strength and intact hand and finger dexterity (Tr. 497-501), plaintiff's stress tests results (Tr. 160, 124-25, 356), and her echocardiogram results (Tr. 353-55).  On October 10, 2002, Dr. Pasquale wrote that plaintiff's general health and vitality level was "well," and that she was healthy enough to be a prospective adoptive parent.  (Tr. 169.)  In 2005 (Tr. 342) and 2006 (Tr. 335-36), Dr. Dorsa reported that (a) plaintiff's coronary heart disease was stable, (b) her hypertension was under control, and (c) her weight was coming down through diet and exercise.

I turn now to the period from May 2006 to the present. Plaintiff's Memorandum, at page 21, makes a cursory argument that the ALJ should have found "severe" carpal tunnel syndrome.  In my view, that argument has no merit at Step Three; on the other hand, the evidence about plaintiff's hands and arms raises questions at Steps Four and Five for the period beginning in May 2006.

Plaintiff testified that, about 8 or 9 months prior to the January 23, 2007 hearing, she started feeling something "like electric shocks" in her hands, "[in] the right hand sometimes, but more in the left hand."  She writes with her right hand, yet "[s]ometimes it's hard for me to write."  She does not use a computer as much as she used to.  (Tr. 646-47.)  She can button buttons, pick up coins from a table, zip a zipper, tie shoelaces, and use a pushbutton phone, but her husband unscrews the caps from her medications.  (Tr. 647-48.)  At Tr. 651-52, the transcript shows:

> Q [by her attorney]  Now you indicated you don't use a computer often.  Tell us why?
> A  Because I'm getting tingling in my hands lately.  I can't type anymore.  It's really, really - -
> RE-EXAMINATION OF CLAIMANT BY [ALJ]:
> Q  Are those your own fingernails?
> A  Yes, they are.  They are sharp.
> Q  Yeah.  That long and you type?  You're able to type with your fingernails that long?
> A  I used to type 100 words a minute at one time.  I can't do that anymore.

The record is unclear as to whether her ability to type and write would improve if she cut her fingernails.

-18-

The only medical evidence about plaintiff's hands and arms is as follows. As I mentioned earlier, Dr. Andrew Decker saw plaintiff on one occasion (October 3, 2006) and performed an electromyographic study and a nerve conduction velocity study. (Tr. 365-69.) He found that plaintiff had (a) left-sided ulnar nerve compression neuropathy at the elbow, and (b) moderately severe right-sided (and mild left-sided) median nerve compression neuropathy at the wrists, "such as seen in a carpal tunnel syndrome." (Tr. 366.) He recommended that she avoid pressure on the left elbow and use an elastic wrap on it. (Plaintiff is right-handed; Tr. 647.) Dr. Decker also recommended wrist exercises, wrist splints, and vitamin B6. (Tr. 367.) He told her to return to his office in two months; there is no evidence as to whether she did so, or as to whether she followed any of his recommendations. Dr. Bernanke testified as follows:

> In terms of manipulation, now she did have this EMG test that was done. However, there are no notes from a neurologist. There's nothing in the chart that indicates the region that they referred her for it. The studies themselves do show some changes, but they don't seem to be that profound really, and particularly with respect to the left arm at the elbow with the involvement of the ulna nerve[,] that describes motor change, that affected the motor portion of the nerve. They don't say anything about the sensory nerve. Now the electric shock she describes could be related to the sensory just as she has related to the median nerve in both of the hands. But I think they described that as being very significant in the report. However, there is no mention of it. There's no neurologic consult and I can't make any further comments on it. An EMG is another test. That's all that it is. It is of help in defining carpal tunnel syndrome, but that can be very, very (INAUDIBLE) clinically. She also had some complaints that indicate she had some sensory difficulty. She would have probably difficulty in manipulation. ...

> Q  So your RFC is for light?

> A  Light, correct. I mean, as I said, you know, she may have some limitation related to the use of her hands, some sensory changes, but there is no real clinical documentation of it in the record.

(Tr. 657-59.) Mr. Crawley's cross-examination of Dr. Bernanke did not discuss plaintiff's hands, nor the issue of whether she

has carpal tunnel syndrome, let alone whether it is "severe."

However, Mr. Crawley's cross-examination of the Vocational Expert made clear that the condition of plaintiff's hands is an important issue at Step Five.  The Vocational Expert conceded that "keyboarding is an important function of th[e] three jobs" of investigator, skip tracer, and police aide; therefore, he seemed to agree that plaintiff might be unable to perform those three jobs if she in fact is limited in keyboarding by a reduction of motor skills due to carpal tunnel or ulna nerve dysfunction.  Two other jobs proposed by him (assembler and electric sealing machine operator) require repetitive fingering and handling; therefore, he seemed to agree that plaintiff might be unable to perform those two jobs if she in fact has more than a mild reduction in her ability to manipulate her fingers and hands.  (Tr. 668.)

Six months later, the ALJ issued his decision.  He did not really grapple with the issue of whether plaintiff "is limited in keyboarding" or the issue of whether she is limited in her ability to perform "repetitive fingering and handling."  He simply wrote:

> At the hearing, the claimant testified that she ... is able to button, use zippers, write and pick up a coin.  She is also able to use a computer keyboard.
>
>       \*     \*     \*
>
> ... She has been documented as having full fine/gross manipulation abilities, and has testified to having no dexterity difficulties.

(Tr. 234-35.)  On the contrary, plaintiff testified that she has some dexterity difficulties that started in 2006.  (Tr. 646-48, 651-52.)  True, she was "documented as having full fine/gross manipulation abilities," but that was in 2003, long before 2006.  (Tr. 489, 505.)  Without discussing the cross-examination of the Vocational Expert, the ALJ's decision wrote:

> ... The vocational expert ... testified that representative occupations such an individual could perform include:  a private investigator, security guard or a patroller.  DOT 336.267-018; 372.667-034; and 376.667-018.  These are jobs that are generally performed at the light exertional level, and they are present in the local economy

at a range of 600-3400 jobs, and in the national
economy at a range of 7,000-31,000 jobs.  The
vocational expert also named sedentary jobs which
such an individual would be capable of performing,
given her transferable skills, including those of
a skip tracer, police aide and an investigator.
These jobs range from 350-3260 in the local economy
and 5000-21000 in the national economy.  DOT
241.367-026; 243.362-014; and 241.267-030.

(Tr. 239.)  It appears that the ALJ did not adopt the testimony
of the Vocational Expert about the jobs of assembler or electric
sealing machine operator.

As to the jobs of skip tracer, police aide, and sedentary
investigator, the Vocational Expert conceded that "keyboarding is
an important function of those three jobs."  (Tr. 668.)
Plaintiff testified: "I used to 100 words a minute at one time.
I can't do that anymore."  (Tr. 65-52.)  In my view, the record
does not show whether, after April 2006, she has retained enough
of her keyboarding ability to perform any of those three jobs
(skip tracer, police aide, sedentary investigator).  The only
medical evidence is her one visit to Dr. Decker in October 2006.
It does not appear that plaintiff talked with him about
keyboarding.  He recommended an elastic wrap on the left elbow,
wrist exercises, wrist splints, and vitamin B6.  There is no
evidence whether she followed any of these recommendations.  Dr.
Bernanke testified that Dr. Decker's EMG test was not conclusive.
On the other hand, Dr. Bernanke said:  "She would have probably
difficulty in manipulation. ... [S]he may have some limitation
related to the use of her hands, some sensory changes, but there
is no real clinical documentation of it in the record."  (Tr.
658-59.)

Even if further evidence shows that plaintiff no longer has
the keyboarding ability needed for those three sedentary jobs, it
may be that she could perform one of the three light-exertion
jobs cited by the ALJ:  "a private investigator, security guard
or a patroller.  DOT 336.267-018; 372.667-034; and 376.667-018."
(Tr. 239.)  I have reviewed those sections of the Dictionary of
Occupational Titles, and they do not seem to require keyboarding.
However, as to the job of security guard, the Vocational Expert
conceded that it requires the ability to walk more than four or
five blocks.  (Tr. 666.)  As to the category of private
investigator, the Vocation Expert testified at Tr. 663 that there
are 1,150 jobs in this category in the regional economy; however,
DOT 376.267-018 shows considerable variety within this category:
some of the job openings would call for the person "to be

-21-

employed in commercial or industrial establishments for undercover work [DETECTIVE (any industry) I] or be assigned to guard persons [BODYGUARD (personal ser.)]." This might conflict with the ALJ's finding that plaintiff is precluded from performing her past relevant work as a police detective, which is "generally performed at the medium exertional level." (Tr. 235, 238.) Finally, there is the position of patroller. The Vocational Expert testified that there are 760 such jobs in the regional economy, and that some of them call for "driving around in a vehicle" and others call for "go[ing] around the property of a subscriber." (Tr. 663-64.) I think it is likely that plaintiff could perform some of the jobs in the categories of patroller and private investigator, but I am not sure whether the number of such jobs would be sufficient for the purposes of Step Five. I recommend that this case be remanded for more precise findings.

### CONCLUSION AND RECOMMENDATION

For the reasons stated above, I recommend that Judge Rakoff (a) deny plaintiff's May 14, 2008 motion for judgment on the pleadings (Docket Item # 8), and (b) partially grant the Commissioner's July 16, 2008 cross-motion for judgment on the pleadings (Docket Item # 10). In my view, the record clearly supports the Commissioner's decision to the extent that it found that plaintiff was not disabled from November 2001 through April 2006. I recommend that Judge Rakoff remand this case for further proceedings to determine whether plaintiff has been disabled during the period from May 2006 to the present.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, any party may object to this recommendation within 10 business days after being served with a copy (i.e. **no later than December 31, 2008**) by filing written objections with the Clerk of the U.S. District Court and mailing copies (a) to the opposing party, (b) to the Hon. Jed S. Rakoff, U.S.D.J. at Room 1340, 500 Pearl Street, New York, NY 10007 and (c) to me at Room 1360, 500 Pearl Street. Failure to file objections within 10 business days will preclude appellate review. *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), and 6(e). Any request for an extension of time must be addressed to Judge Rakoff.

DOUGLAS F. EATON
United States Magistrate Judge

-22-

500 Pearl Street, Room 1360
New York, New York 10007

Dated:    New York, New York
          December 15, 2008

Copies of this Report and Recommendation are being faxed to:

Edward J. Madigan, Esq.
Meltzer, Fishman, Madigan & Campbell
225 Broadway, Suite 2605
New York, NY 10007
     (at fax 212-791-5912fax)

Susan C. Branagan, Esq.
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, NY 10007
     (at fax 212-637-2750fax)

Hon. Jed S. Rakoff